IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DAVID J. CARRERA,

                    Petitioner,

          vs.

ERIC ARNOLD, Warden, California State
Prison, Solano,[1]

                    Respondent.

No. 2:15-cv-00732-JKS

MEMORANDUM DECISION

          David J. Carrera, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254.  Carrera is in the custody of the California

Department of Corrections and Rehabilitation and incarcerated at California State Prison,

Solano.  Respondent has answered, and Carrera has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

          On March 17, 2011, Carrera, along with co-defendants Terry Alexander and Alex Brown,

was charged with first degree murder (Count 1), attempted robbery (Count 2), kidnapping to

commit robbery (Count 3), five counts of first-degree robbery (Counts 4-5, 7-9), carjacking

(Count 6), three counts of assault with a deadly weapon (Counts 10-12), six counts of forcible

oral copulation in concert (Counts 13-18), and three counts of forcible sodomy (Counts 19-21).

The information alleged numerous enhancements with respect to each of the counts.  On

February 16, 2011, Carrera was tried before a jury with Brown and Alexander.  On direct appeal

---

[1]      Eric Arnold, Warden, California State Prison, Solano, is substituted for Raymond
Madden, Warden, Centinela State Prison.  FED. R. CIV. P. 25(c).

of his conviction, the California Court of Appeal recounted the following facts underlying the

charges against Carrera:

A

*The December 2005 Crimes*

Hugo S. lived alone in a house in Oak Park. He used drugs and sold them. Hugo S. knew defendant Brown because Hugo's niece was married to Brown. He knew defendant Carrera because Carrera was his sister-in-law's cousin.

At night on December 26, 2005, Hugo S. was in his living room when his front door "fl[ew] open and three guys . . . c[a]me in." Hugo S. identified the guys as Carrera, Brown, and an unknown third man (later identified by another victim as defendant Alexander). Defendants threw Hugo S. on the ground, beat him "[e]verywhere," and stole everything in his house, including jewelry, flat screen televisions, computers, motorcycles, and pictures. Defendants ordered him to call somebody with money or else they would kill him. Eventually Hugo S. called Renee M., a friend who sold drugs, and asked her to come over. She told him she would stop by for just a little while, because her roommate, Christopher P., was going to be waiting in the car.

When Renee M. got to Hugo S.'s house, a man invited her in, and when she walked in "the next thing [she] kn[e]w, [she] had a gun in [her] face." She identified the man who invited her in as Carrera and the man with the gun as Alexander. Alexander demanded her money and drugs, but she lied and said she did not have any, even though she had money in her car. A bloodied, shirtless, and tied-up Hugo S. pleaded with her to give them her money or else defendants were going to kill them.

Carrera left to get Christopher P., who was still in the car. While Carrera was gone, Brown ripped Renee M.'s clothes off and punched her in the face, knocking out a tooth. He took her jewelry. He yelled that he was going to "rape [her] ass." When she said she was on her period and had a "plug in," he told her to take it out and throw it at Hugo S. She complied, but when Brown tried to rape her, Carrera walked in with Christopher P. and was holding a gun.

Carrera gave the gun back to Alexander and then the three defendants beat up Christopher P., asked him whether he was a gang member, and undressed him. Brown starting spanking Christopher P., asking him if "he was a faggot."

Wanting the beating to stop, Renee M. told Carrera she had money in her car, and Carrera came back with about $2,000 and some methamphetamine.

After Carrera came back, defendants started taking pictures of Renee M., Christopher P., and Hugo S. Defendants had them stand up and pose in different positions. They pushed Renee M.'s face onto Hugo S.'s genitals and told her to "suck him." Then they made her sit on Christopher P.'s face with her vagina touching it. The victims complied because there was a gun to their heads. Brown tried to poke an antenna "at [Renee M.'s] butt," but she squirmed away. Defendants made Renee M. put her finger inside Christopher P.'s anus, with the gun used for compliance. Carrera then

2

positioned Renee M. "doggy style" and tried to have Hugo S. penetrate her from behind, but he could not get an erection. Simultaneously, defendants pushed Renee M.'s face down on Christopher P.'s genitals.

Around 1:30 a.m. or 2:00 a.m. the following morning (December 27, 2005), a neighbor named David T. came to Hugo S.'s house to buy drugs. Carrera answered the door, and David T. recognized him because he knew Carrera's older brother. Carrera and the two other defendants took David T.'s personal belongings and severely beat him, requiring three days' hospitalization.

After beating up David T., defendants left, but before they did, Carrera and Brown said "Oak Park Bloods" and threatened to kill all of the victims.

On December 31, 2005, Dominic G. (whose sister Sophia G. was dating Carrera) was hanging out at Carrera's house. Alexander or Carrera showed Dominic G. a picture on a phone depicting "naked people," a "[g]uy behind a girl," and said they had made them have sex with each other and "made a girl give a guy head." They also showed Dominic G. the jewelry they had taken. Carrera told Dominic G. that Brown was the third person involved in the invasion of Hugo S.'s house.

Brown sold his friend Mohamad A. a big screen television that was stolen from Hugo S. during the home invasion. Brown gave his ex-wife jewelry that had been stolen from Renee M. during the home invasion.

B

*The January 2006 Crimes*

In December 31, 2005, Brown borrowed a maroon Hummer from Mohamad A.'s cousin.

On the evening of January 2, 2006, Brown and Alexander were hanging out with Carrera in his house, along with Dominic G. Defendants were snorting cocaine. Carrera or Alexander asked Dominic G. if they could rob "[his] friend." Dominic thought they were talking about his friend Jeremy H. with whom Dominic "did business" and whom he had mentioned one month back when defendants had previously brought up the topic of robbing one of Dominic's friends. At that time, Dominic G. had told Carrera and Alexander where Jeremy H. lived, what kind of drugs he sold, and what kind of car he drove (a white one with large rims). Within the month, Carrera had scoped out the house. This time, Dominic G. drew a diagram of the inside of Jeremy H.'s house. The three defendants then left.

Around 2:00 or 3:00 a.m. on January 3, 2006, James H. (the brother of Jeremy H.) was playing video games when he heard a big truck or Hummer drive by the house in which he lived with his brother and mother. Jeremy H. sold marijuana, which he kept in his room and in a safe in the detached garage. James H. heard a knock at the door and saw two men (Brown and Alexander) standing outside. Brown and Alexander kicked in the door and ran into the house. James H. tried unsuccessfully to barricade himself in his brother's room, but Brown and Alexander kicked down the bedroom door and started pistol-whipping both brothers. Brown and Alexander asked the brothers for marijuana

and money, severely beat them, threatened to kill them, and ransacked the room. Eventually, Jeremy H. gave Brown and Alexander the key to the safe and led them to the backyard detached garage where the safe was. There was not much marijuana or money in the safe, which upset Brown and Alexander, and they again threatened to kill Jeremy H. Brown and Alexander ended up taking $60 from the drawers in the bedroom and some of Jeremy H.'s jewelry. They wanted to know where Jeremy H. got his marijuana. Jeremy H. was selling drugs with Ramirez (the eventual murder victim), and they got the marijuana from Matt B. who lived in Curtis Park. Jeremy H. told them, "'I can get . . . hold of [Ramirez] but I don't have no way to get a hold of Matt. I can't help you get to Matt but [Ramirez] might be able to.'" Brown and Alexander said, "'All right. Well let's go. We are going to get him.'"

Brown and Alexander stole the key to Jeremy's Buick and forced the brothers into the Buick. Alexander drove and Brown was in the rear passenger seat. They could not find Matt B.'s house, so Brown and Alexander asked where Ramirez lived. Jeremy said he lived in Land Park and he should have money or be able to get in touch with Matt. B. In the car, Brown snorted drugs.

Sometime during this drive, Alexander returned to Carrera's house and told Dominic G. they had the brothers outside. Dominic looked outside and saw Jeremy H.'s car. Alexander put marijuana and jewelry in the house and left.

Alexander and Brown drove in Jeremy H.'s car to Ramirez's Land Park home. Using a gun for compliance, Brown and Alexander made Jeremy H. knock on the door to wake Ramirez. While walking up to the house, Jeremy H. saw a red Hummer. After Jeremy H. knocked and the door opened, Brown "basically engaged [with Ramirez] while [Ramirez] was opening the door, and the gun went off that quick. It was no more than a second." Brown had shot Ramirez fatally in the chest. Jeremy H. ran into Ramirez's backyard and waited there until police arrived. James H. eventually fled on foot to his cousin's house.

That night, sometime after 8:00 or 10:00 p.m., Carrera, who was driving a dark red Hummer, picked up his girlfriend Sophia G. While Carrera and Sophia G. were in the Hummer, Alexander called Carrera and told him to meet him by the baseball diamonds in South Land Park. Thereafter, Sophia G. heard Alexander say, "'They don't have it. We are going somewhere else. We have to go somewhere else.'" Carrera explained to Sophia G. that "whoever was in the car didn't have the weed or the money that they were going to get from them. So they were going to take [them] somewhere else to get it." When Carrera and Sophia G. arrived near the baseball diamonds, Sophia G. saw Alexander jump out of the driver's seat of a white car. Alexander ran up to the Hummer's window and said, "they had to go somewhere else." So Carrera followed the white car to the court where Ramirez lived. Brown then got out of the passenger's side of the white car with a gun in hand and was walking with a young man (Jeremy H.), who looked "so scared." Sophia G. heard a gunshot and a "really loud scream" from a man's voice and saw Brown run back into the white car. A short time later, Brown and Alexander jumped out of the white car and into the backseat of the Hummer, and Brown said he "had to do it." Brown and Alexander eventually got rid of the gun. Carrera did

not return the Hummer until after this incident, at which time he told Mohamad A. the police might be looking for it.

C

*Events After Both The December 2005 Home Invasion And The January 2006 Murder*

Within a month of the two sets of crimes, Dominic G. and Sophia G. met Alexander at Mr. Perry's Restaurant. Alexander told them "everything that had happened the whole time they were [at Hugo. S.'s house]," including that they had gone there to "get some money or some drugs," "they started making [the victims] take their clothes off," the woman "was on her period" and "it was really gross," he "started laughing about the whole thing . . . and it just started getting just really gross."

Brown was interviewed by police in August 2007. Among other things, Brown said he did not know Alexander.

D

*Gang Evidence*

According to Dominic G., Carrera was a member of the 33rd Street Oak Park gang. According to Sophia G., Alexander was part of a subset of the Oak Park gang called Ride–Zilla.

According to the People's gang expert, Carrera and Alexander were validated Oak Park Blood gang members and Brown was an associate. The expert was of the opinion that a hypothetical home invasion mirroring the facts of Hugo S.'s home invasion was committed for the benefit of the Oak Park Bloods.

E

*Uncharged Misconduct*

Carrera committed four uncharged crimes. The first was when Carrera made David S. strip naked, put on a pair of woman's thong underwear, and then assaulted him, while Carrera's friend took pictures. The second was when Carrera instigated the home invasion robbery of Larry V. The third was with Dominic G. and "Bill" when Carrera instigated a home invasion of "Tony", but they left Tony's neighborhood when Dominic could not figure out which house it was. And the fourth was with Dominic G. and Alexander present, when Carrera robbed a man who came to his house to buy crystal methamphetamine.

Alexander had one uncharged act of misconduct. In January 2009, Alexander admitted to police in an interview that he had a "bad drug problem," which involved him using $25 to $150 worth of pure cocaine a day, including the day of the police interview.

*People v. Brown*, No. C068970, 2013 WL 5785008, at *1-4 (Cal. Ct. App. Oct. 25, 2013).

At the conclusion of trial, the jury found Carrera and his co-defendants guilty as charged and also found true each of the enhancement allegations. The trial court subsequently sentenced Carrera to a term of life imprisonment without the possibility of parole ("LWOP") on Count 1, plus an indeterminate term of 977 years to life consecutive and an additional determinate term of 493 years, 4 months.[2]

Through counsel, Carrera appealed his conviction, arguing that: 1) the prosecution violated its duty of disclosure by failing to disclose that the prosecution's star witness, who had been in jail when he testified in Carrera's case, had his own case completely dismissed; and 2) the trial court erred in denying his motion to sever the counts of the indictment. In a reasoned, unpublished opinion issued on October 25, 2013, the Court of Appeal affirmed the judgment against Carrera and his co-defendants in all respects. *Brown*, 2013 WL 5785008, at *14. The record before this Court does not indicate that Carrera petitioned for review in the California Supreme Court.

Carrera then filed a *pro se* petition for habeas relief in the California Supreme Court in which he alleged that: 1) the trial court erred in failing to suppress evidence obtained from an allegedly-unlawful search of his home; 2) trial counsel was ineffective for failing to move for suppression of his co-defendant's phone on the ground that it was recovered during an illegal search of Carrera's home; 3) the prosecution failed to disclose evidence that a prosecution

---

[2] The court sentenced Brown to a term of LWOP on Count 1, plus an indeterminate term of 257 years to life consecutive, plus an additional determinate term of 281 years, 4 months. The court sentenced Alexander to a term of LWOP on Count 1, plus an indeterminate term of 232 years to life consecutive and an additional determinate term of 246 years, 4 months.

witness had received favorable treatment in his own case in return for his testimony in Carrera's case, and Carrera was unable to impeach the witness with that evidence; 4) the trial court erred in denying the motion he and Brown filed to sever the counts relating to the murder (Counts 1-6) from the counts relating to Hugo S.'s home invasion (Count 7-21); and 5) appellate counsel was ineffective for failing to challenge the court's admission of: a) testimony from his ex-girlfriend, and b) Carrera's prior uncharged bad acts. The Supreme Court denied the petition without comment on December 17, 2014.

Carrera then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on January 9, 2015. *See* 28 U.S.C. § 2244(d)(1)(A).

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Carrera raises the five claims he unsuccessfully raised to the state courts by habeas petition (two of which he also raised before the Court of Appeal on direct appeal). First, he argues that the trial court erred in failing to suppress evidence obtained from an allegedly-unlawful search of his home. He next claims that trial counsel was ineffective for failing to move for suppression of his co-defendant's phone on the ground that it was recovered during an illegal search of Carrera's home. In Ground 3, Carrera contends that the prosecution failed to disclose evidence that a prosecution witness was receiving favorable treatment in his own case in return for his testimony in Carrera's case, and Carrera was unable to impeach the witness with that evidence. He additionally alleges that the trial court erred in refusing to sever the counts relating to the murder (Counts 1-6) from the counts relating to Hugo S.'s home invasion (Count 7-21). Finally, he argues that appellate counsel was ineffective for

failing to challenge the court's admission of testimony from his ex-girlfriend and evidence of his prior uncharged bad acts.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Carrera has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

Ground 1.    <u>Fourth Amendment Claim</u>

Carrera first challenges the search of his home on Fourth Amendment[3] grounds. His claim, however, is not cognizable on federal habeas review because his arguments are precluded by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976).[4] Under *Stone*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a claim that evidence recovered through an illegal search or seizure was introduced at trial. The *Stone v. Powell* doctrine applies to all Fourth Amendment claims, including claims of illegal stops, arrests, searches, or seizures based on less than probable cause, and it applies regardless of the nature of the evidence sought to be suppressed. *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983) (per curiam).

The Ninth Circuit has made clear that all *Stone* requires is that the State provide a petitioner the opportunity to litigate his Fourth Amendment claim. *See Moormann v. Schiro*, 426

---

[3]    The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

[4]    Notably, the Supreme Court has concluded that the restrictions on federal habeas review of Fourth Amendment claims announced in *Stone* do not extend to Sixth Amendment claims of ineffective assistance of counsel challenging counsel's actions with respect to motions to suppress evidence allegedly obtained in violation of the Fourth Amendment. *Kimmelman v. Morrison*, 477 U.S. 365, 382-83 (1986). Because of this, Carrera's ineffective assistance claim relating to counsel's failure to move for suppression of his co-defendant's phone (Ground 2) is cognizable on federal habeas review and discussed *infra.*

10

F.3d 1044, 1053 (9th Cir. 2005). "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." *Oritz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996). California provides such an opportunity, *see* CAL. PENAL CODE § 1538.5; *Gordan v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990), and thus Carrera's Fourth Amendment claim is not cognizable here.

Grounds 2, 5. <u>Ineffective Assistance of Counsel</u>

Carrera additionally contends that both trial and appellate counsel rendered ineffective assistance. To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. 668, 687 (1984). A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief. *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95. Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.[5] *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also*

---

[5] *See Brecht v. Abrahamson*, 507 U.S. 619, 639 (1993) (instructing that, where the standard applies, habeas relief is not warranted unless the error "had [a] substantial and injurious effect or influence in determining the jury's verdict").

*Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009). Under this rubric, in reviewing

ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold." And, because the
> *Strickland* standard is a general standard, a state court has even more latitude to
> reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Carrera must show that defense counsel's representation was not within the range

of competence demanded of attorneys in criminal cases, and there is a reasonable probability

that, but for counsel's ineffectiveness, the result would have been different. *See Hill v. Lockhart,*

474 U.S. 52, 57 (1985). An ineffective assistance of counsel claim should be denied if the

petitioner fails to make a sufficient showing under either of the *Strickland* prongs. *See*

*Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not

address both prongs if the defendant fails on one).

A.      *Trial counsel*

Carrera alleges that trial counsel was ineffective for failing to move for suppression of his

co-defendant's phone, which was obtained as a result of an allegedly-illegal search of Carrera's

home. However, the record reflects that trial counsel filed a motion to suppress evidence on the

ground that the search was unlawful because the officers searched the residence before obtaining

a search warrant. The record further reflects that the trial court held a hearing on the motion.

After a detective who searched the residence testified, the trial court concluded, "Based on what

I've heard, I am quite confident that the officer testified truthfully; that is, no one entered the

house prior to the execution of the search warrant . . . [and] the search is lawful." Because counsel did in fact file a suppression motion, Carrera fails to show that counsel was ineffective in that regard.

To the extent that Carrera's claim could be liberally construed, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), to challenge the trial court's denial of the suppression motion, Carrera fails to establish entitlement to relief. In his habeas petitions filed in the state courts, Carrera merely stated that an unnamed neighbor and unnamed family saw the police leave his home before the warrant was obtained. But such argument is far too speculative to demonstrate that the search was illegal, and wholly insufficient to establish entitlement to habeas relief. *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (granting habeas relief "on the basis of little more than speculation with slight support" is improper); *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001) (unsupported, conclusory allegations are not enough to warrant an evidentiary hearing). Carrera's claim thus fails in any event.

B.   *Appellate Counsel*

Carrera additionally faults appellate counsel for failing to challenge the admission of testimony from his ex-girlfriend and evidence of his prior uncharged bad acts. Neither argument has merit.

First, Carrera fails to explain how appellate counsel could have argued that the ex-girlfriend's testimony should have been excluded. The record reflects that his ex-girlfriend provided eyewitness testimony relating to the January 2006 murder and a later meeting in which co-defendant Alexander told her a number of details about the December 2005 home invasion, and testimony that the gun used in the murder was Carrera's favorite gun. Carrera provides no

basis for excluding such relevant highly probative evidence.  Carrera argues that his ex-girlfriend was not credible because her testimony was given under the "threat of her and her brother being arrested."  But that raises an issue for impeachment on cross-examination; not a basis for exclusion.

Nor can Carrera demonstrate that appellate counsel should have challenged the admission of evidence of his prior uncharged bad acts.  He appears to argue that they should have been excluded because: 1) he was never charged in those instances; and 2) the acts were at least six years old.  California Evidence Code § 1101(b)[6] permits evidence of other uncharged acts to be admitted to show a defendant's intent, among other things.  *See, e.g.*, People v. Soper, 200 P.3d 816, 830 (Cal. 2009) (A fact finder properly may consider admissible "other crimes" evidence to prove intent, so long as the evidence is sufficient to sustain a finding that the defendant committed both sets of crimes and "'the factual similarities among the charges tend to demonstrate that in each instance the perpetrator harbored' the requisite intent." (citations omitted)).  Because the similarity between the prior uncharged acts and the charged conduct, both of which are described in the above recitation of the Court of Appeal's opinion, was striking, and the evidence was highly probative, Carrera fails to establish that appellate counsel's potential challenge to the admission of that evidence could possibly have been successful.  *See Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012) ("Counsel is not necessarily ineffective

---

[6]     "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."  CAL. EVID. CODE § 1101(b).

for failing to raise even a nonfrivolous claim, so clearly we cannot hold counsel ineffective for failing to raise a claim that is meritless." (internal citation omitted)); *Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard."). Carrera therefore fails to show that he is entitled to relief on these grounds.

Ground 3.     <u>Prosecution's Failure to Disclose Impeachment Evidence</u>

Carrera next argues that the prosecution violated its mandatory duty of disclosure under *Brady*[7] by failing to disclose evidence that Carrera could have used to impeach a prosecution witness. *Brady v. Maryland*, 373 U.S. 83 (1962), and its progeny require the prosecution to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). A *Brady* violation occurs only where there is a "reasonable probability" that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed. *Id.* at 281. That is, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985).

On direct appeal, the Court of Appeal considered and rejected Carrera's claim as follows:

> The alleged *Brady* material here was the People's failure to disclose that it was giving a case in which Jeremy H. was the defendant a "'fresh look,'" which Carrera claimed was "potential impeachment as to [Jeremy H.'s] state of mind while he was on

---

[7]     *Brady v. Maryland*, 373 U.S. 83 (1963). The term "*Brady*" is a shorthand reference to the rules of mandatory discovery in criminal cases under federal law. *Brady* and its progeny require the prosecution to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

the witness stand."  Specifically, the new trial motion argued the following: "at the time [Jeremy H.] was on the witness stand it had been communicated to his attorney that the District Attorney's Office was actively reinvestigating his case and pursuing leads that could result in any number of outcomes favorable to [Jeremy H.]—lowering bail, release on own recognizance, a favorable plea bargain offer or outright dismissal."  Carrera argued the People had suppressed this "'fresh look'" evidence and he was prejudiced because he could not effectively cross-examine Jeremy H.

        In denying Carrera's motion for new trial, the court concluded there was no impeachment or exculpatory evidence the People failed to disclose.  The trial court was correct.  The People presented the testimony of the deputy district attorney working on Jeremy H.'s case who testified the case was not "in any way getting any special treatment or any fresh look . . . based on the fact that [he] was a witness in this case."  Jeremy H.'s case was dismissed for insufficient evidence because "the lab reports, the DNA reports and the two ballistics reports" "were exculpatory as to [Jeremy H.]."  The People also presented the testimony of Jeremy H.'s attorney who testified "there [were] [n]ever at all any promises, offers, or any inducements that related to [Jeremy H.] and [the case in which he was defending Jeremy H.]" and there was no "indication or any conversation . . . about the fact that [Jeremy H.] was going to testify [in this case] and how it might impact the case he was charged with."  As the trial court concluded, "[t]here's absolutely no evidence on this record which credibly suggests that the dismissal had anything to do with the case against the defendants [in this case]."  And "the fact that the forensics testimony supported [Jeremy H.'s] innocence in no way affected his potential impeachment and would have made absolutely zero difference to the fact finder in this case, particularly in light of the mountain of devastating evidence against these defendants."  On this record, the trial court did not abuse its discretion in denying [Carrera's] new trial motion because there was no *Brady* violation.

*Brown*, 2013 WL 5785008, at *12.

Carrera fares no better on federal habeas review.  The Court of Appeal's conclusion that the evidence in question did not constitute *Brady* material is both reasonable and supported by the record in light of the testimony that was received at the hearing on Carrera's motion for a new trial.  While it certainly gives the Court pause that the witness may have believed that, despite not receiving direct promises, his testimony against Carrera would nonetheless have influenced a more favorable outcome in his own case, the Court does not find the denial unreasonable or contrary to federal law, particularly given the AEDPA deference required.

Moreover, because the other evidence against Carrera was overwhelming, the Court also finds

reasonable the Court of Appeal's conclusion that there was no "reasonable probability" that a different verdict would have resulted from disclosure of that information. *Strickler*, 527 U.S. at 281. Carrera's *Brady* claim therefore must fail.

Ground 4.     Denial of Severance Motion

Finally, Carrera claims that the trial court violated his due process rights when it denied his motion to sever the murder counts (Counts 1-6) from the counts relating to Hugo S.'s home invasion (Counts 7-21). Improper joinder, or erroneous denial of a severance motion, does not itself violate the Constitution. *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). In *Lane*, the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Id.* The Ninth Circuit subsequently stated in an unpublished opinion:

> *Lane* considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. *See Lane*, 474 U.S. 438, 446 & n.9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, Lane's broad statement—found in a footnote without citation to any legal authority—that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

*Young v. Pliler*, 273 F. App'x 670, 672 n.1 (9th Cir. 2008); *see also Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir. 2010).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "In other words, 'clearly established

17

Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* Given that there is no clearly established Federal law in this instance, this Court cannot grant relief, since habeas relief is warranted only when the state court adjudication runs afoul of clearly established federal law. *See Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that squarely addresses the issue, it "cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent . . . and so we must defer to the state court's decision").

In any event, the state courts reasonably rejected Carrera's claim. *See Young*, 273 F. App'x at 672 (assuming *Lane* provided the relevant Supreme Court precedent to reach the merits of petitioner's claim that joinder of murder charge and assaults charges violated his constitutional rights). A joinder, or denial of severance, of counts may rise to a constitutional violation if it results in prejudice great enough to render the trial fundamentally unfair. *Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997). There is a "high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir. 1986) (quoting *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985)). But joinder generally does not result in prejudice if the evidence of each crime is simple and distinct (even if the evidence is not cross-admissible), and the jury is properly instructed so that it may compartmentalize the evidence. *Bean v. Calderon*, 163 F.3d 1073, 1085-86 (9th Cir. 1998).

Even assuming, arguendo, that the Supreme Court's footnote could be considered clearly established Federal law, no constitutional violation occurred in this case, because the prejudice

was not so great as to deny Carrera his right to a fair trial.  In denying this claim on direct appeal,

the Court of Appeal concluded:

> The evidence was cross-admissible because the two sets of crimes were connected in their commission.  As the trial court put it, the gang evidence was "relevant and admissible in the homicide case regardless of the lack of [the gang enhancement] on the very crucial issues . . . [of] intent, motive, existence of a conspiracy, cooperation or lack of cooperation of the witnesses, and how they may respond to questioning during trial."  In line with the trial court's reasoning, our Supreme Court has held "evidence of gang membership is often relevant to, and admissible regarding, the charged offense.  Evidence of the defendant" gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)
>
> Furthermore, as the trial court also explained, the similarities between the counts relating to the murder and those relating to Hugo S.'s home invasion was "striking."  "The target, the method and the goals [of the crimes] [w]ere virtually identical."  Both the murder and Hugo S.'s home invasion involved the same defendants who were members of the Oak Park Blood criminal street gang; they targeted similarly situated individuals in the drug trade who possessed or had access to drugs and/or money; they commenced the offenses in a similar manner through home invasions with a substantial degree of violence and threats, including using firearms; and sought to obtain drugs, money, or other valuables in both incidents.
>
> As to defendants' argument the counts related to the murder should have been severed from the counts related to Hugo S.'s home invasion, because the gang and sexual evidence associated with counts seven through twenty-one were "unusually inflammatory," as the trial court aptly noted, neither of the two events was more inflammatory than the other.  "One . . . involve[d] senseless, cruel sex acts, while the other involve[d] a[ ] . . . completely senseless killing."  Where defendants "ha[v]e not shown that one of the offenses was significantly more likely to inflame the jury against defendant[s]," they "failed to establish prejudice."  (*People v. Bradford* (1997) 15 Cal.4th 1229, 1317.)
>
> Given the cross-admissibility of the evidence and defendants' inability to establish prejudice from the failure to sever, the court was well within its discretion to deny defendants' motions to sever the offenses related to the murder from the offenses related to Hugo S.'s home invasion.

*Brown*, 2013 WL 5785008, at *5.

The appellate court's determination is reasonable and fully supported by the record, and

comports with applicable federal law.  *See Davis v. Woodford*, 384 F.3d 628, 638-39 (9th Cir.

2004) (denial of motion to sever trial of capital and noncapital charges based on separate incidents not a violation of due process because evidence was cross-admissible, the weight of evidence with respect to each incident was roughly equal, the evidence as to each incident was distinct, and the jury was properly instructed); *Sandoval v. Calderon*, 241 F.3d 765, 773 (9th Cir. 2001) (given the strength of the prosecution's case against petitioner on both sets of murders and the cross-admissibility of the evidence on each set, petitioner's trial was not actually prejudiced by the joinder).  Accordingly, Carrera's severance claim does not merit federal habeas relief.

V. CONCLUSION AND ORDER

Carrera is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability solely with respect to whether the prosecution failed to disclose evidence that a prosecution witness was receiving favorable treatment in his own case in return for his testimony in Carrera's case (Ground 3).  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"

(quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 3, 2017.

   /s/James K. Singleton, Jr.   <br>
JAMES K. SINGLETON, JR.<br>
Senior United States District Judge